McCALLISTER v McCALLISTER

Docket No. 45334. Submitted April 9, 1980, at Detroit.—Decided
November 19, 1980.

Philip McCallister filed for and was granted a judgment of
divorce from Mary McCallister, Wayne Circuit Court, Peter B.
Spivak, J. He appeals, alleging that the trial court erred in its
award of alimony and in including plaintiff's interest in a
pension as a marital asset and that the trial court abused its
discretion in awarding defendant attorney fees and in failing to
make a finding of fact concerning the extent of the parties'
debts. *Held:*

1. The trial court erred in not providing for modification of
alimony payments in the event of a change in circumstances.

2. The trial court properly included plaintiff's pension inter-
est as a marital asset, but erred in awarding plaintiff only an
indeterminate lien on the marital home.

3. A review of the record *de novo* does not indicate that, if
the Court of Appeals had decided the case in the first instance,
it would not have awarded defendant attorney fees in the
amount which was awarded.

4. The trial court abused its discretion in failing to make a
finding of fact regarding the extent of each party's debt obliga-
tion.

Affirmed in part, reversed in part, and remanded.

1. APPEAL — DIVORCE — PROPERTY SETTLEMENTS — STANDARD OF
REVIEW.

The Court of Appeals hears appeals in divorce cases *de novo,* but
it generally will not reverse a property settlement rendered by

REFERENCES FOR POINTS IN HEADNOTES
[1] 4 Am Jur 2d, Appeal and Error § 135.
  5 Am Jur 2d, Appeal and Error § 868.
[2] 24 Am Jur 2d, Divorce and Separation §§ 925, 928, 933.
[3-5] 24 Am Jur 2d, Divorce and Separation § 632.
  60 Am Jur 2d, Pensions and Retirement Funds § 80.
  Pension of husband as resource which court may consider in
  determining amount of alimony. 22 ALR2d 1421.

a trial court unless it is convinced that it would have reached a different result had it sat as the trier of fact.

2. DIVORCE — PROPERTY SETTLEMENTS — FACTORS AFFECTING DISTRIBUTION.

The equitable distribution of property in a divorce judgment is affected by the source of the property, contribution toward acquisition of the property, the length of the marriage, the needs of the parties, and the earning abilities of the parties.

3. DIVORCE — PROPERTY SETTLEMENTS — MARITAL ASSETS — PENSION INTERESTS.

A pension interest should be included as a marital asset for purposes of determining a property settlement in a divorce action where the pension was created in part from deductions from the salary of one of the marriage partners.

4. DIVORCE — PROPERTY SETTLEMENTS — MARITAL ASSETS — PENSION INTERESTS — REASONABLY ASCERTAINABLE VALUE.

Pension interests are distributable in a property settlement in a divorce action only where they are marital assets with a reasonably ascertainable value; interests which are contingent upon the happening of an event which may or may not occur are not distributable.

5. DIVORCE — PROPERTY SETTLEMENTS — MARITAL ASSETS — PENSION INTERESTS — REASONABLY ASCERTAINABLE VALUE — BURDEN OF PROOF.

A party seeking to include a pension interest in a marital estate should bear the burden of proving its reasonably ascertainable value; if the burden is not met, the interest should not be considered an asset subject to distribution.

*Irving M. Stahl,* for plaintiff.

*Stuart A. Fraser,* for defendant.

Before: DANHOF, C.J., and CYNAR and MAC-KENZIE, JJ.

CYNAR, J. Plaintiff, Philip McCallister, filed for a divorce on February 3, 1978. A judgment of divorce was granted following trial in Wayne County Circuit Court. Plaintiff appeals as a matter of right pursuant to GCR 1963, 806.1.

Plaintiff, Philip McCallister, and defendant, Mary McCallister, were married on April 13, 1968. This was the second marriage for both of the parties. Each previous marriage of the parties ended in a divorce. The plaintiff had three children by his previous marriage, and the defendant had four children by her previous marriage. No children were born as a result of plaintiff's and defendant's marriage. At the date of trial, November 16, 1978, the plaintiff was 50 years old, and the defendant was 51 years of age.

At the time of trial, plaintiff was paying child support for one of his children by his first marriage. Plaintiff paid alimony to his first wife while he was married to defendant. During this marriage, plaintiff made contributions to the support of defendant's children by her previous marriage.

At the time of the parties' marriage on April 13, 1968, defendant was renting a house in Pontiac Township owned by her brother, and both parties decided to continue to rent the Pontiac Township residence. The plaintiff testified that, after approximately three years of leasing the house in Pontiac Township to the parties, the defendant's brother expressed a desire to sell the premises. Plaintiff testified that, since he was not able to finance property on the east side and defendant was not willing to move to the east side at that time, the parties purchased the Pontiac Township residence. The plaintiff stated that he decided to move from the Pontiac Township residence because neither his employment, children, or recreation (sailing his boat) were located close to the Pontiac residence. The plaintiff testified that, although the defendant was not delighted at the prospect of moving to Grosse Pointe, she agreed to the move.

The defendant testified that she was unwilling

to move because the move would affect her job, that she was a tenured speech therapist in the Pontiac school system at the time the parties were married, and that in 1973, her gross income from such a position was $15,143.83. The reasons given by defendant for her unwillingness to move were that her tenured position was in the City of Pontiac, that her son was finishing his junior year in high school, and that her daughter was finishing a program at Oakland Community College. According to the defendant, the move was to the advantage of her husband and to her disadvantage. The plaintiff testified that the defendant had stated that one of her objections to the move was that her specialty was in short demand on the east side of town. The defendant, at the time of trial, was working 20 hours per week as a receptionist at the information desk at Bon Secours Hospital in Grosse Pointe.

In June of 1974, the parties purchased a condominium in Grosse Pointe. The Pontiac Township residence was sold for $33,750, and the parties used some of the money they received to put 20 percent down on the purchase price of the Grosse Pointe residence. At the time of trial, the equity in the Grosse Pointe home was $33,000.

After the parties moved from Pontiac Township to Grosse Pointe, some six years after their marriage, defendant took a leave of absence from her employment. She failed to pick up her option to renew her employment, thereby losing her tenure. Plaintiff testified that, within a year after they were married, the defendant had told him that she was tired of working and that she thought he should take care of her and that the plaintiff replied that, with the responsibilities of seven children and college, he thought she should con-

tinue to work. Plaintiff further testified that, when defendant told him she had taken a leave of absence, he told her that he thought she should attempt to find employment right away, either on the east side of town or that she should continue her employment in Pontiac. Plaintiff testified that he offered to pay for the defendant's further education and he stated that she was not interested. Plaintiff testified that he made it clear to her from the time that she took her leave of absence that he was not in favor of it.

Defendant testified that she liked working. She stated that she made efforts to secure employment on the east side of town prior to the expiration of her one year leave of absence from the Pontiac school system, however, such efforts were fruitless. The defendant testified that the plaintiff told her he had decided he did not want her to continue to work. The defendant further testified that the plaintiff told her that he was making good money and things were looking good so that she could relax and rely on him.

On cross-examination, the defendant stated that plaintiff had objected to her leaving her job. Defendant acknowledged that plaintiff had offered to pay for her further education. Defendant stated that she went to register at Wayne State University but never completed registration.

Plaintiff testified at trial that the defendant became extremely critical of him. Plaintiff testified that both defendant and he had gone to a marriage counselor to help save their marriage. Plaintiff testified that the defendant told him on several occasions that she did not marry him to cook his meals or to do his laundry. Plaintiff stated that for many years he went to a laundromat, that the defendant was unwilling to recognize their level of

income and spent too much money, that the defendant refused to vacation with him, and that she had offered little companionship to the plaintiff in the last few years of their marriage.

The plaintiff admitted on cross-examination that he was residing, at the time of trial, with another woman. The plaintiff testified that he met this other woman on April 7, 1978, that he had taken three trips with this other woman, and that he contributed to the expenses for meals while he stayed at her residence.

Plaintiff is a civil engineer who has been employed by the United States Army Corps of Engineers since 1958, earning some $44,500 a year at the time of trial. Sharlyn Wilkerson, a personnel management specialist for the Corps of Engineers who was subpoenaed to testify at trial, stated that plaintiff had a life insurance policy which would pay $47,000 upon his death. Ms. Wilkerson further testified that, on June 28, 1978, the named beneficiary of said policy was changed from a person whom she was unable to identify to the three daughters of plaintiff by his previous marriage. Ms. Wilkerson testified that plaintiff had a pension fund which, at the end of the 1977 calendar year, contained the sum of $26,028.62, and that plaintiff contributed to the pension fund at a rate of approximately seven percent of his salary.

There was testimony that, at the time of trial, the martial home had an equity of $33,000, that plaintiff owned a sailboat worth approximately $5,000, that the sailboat was security for $3,000 of an $8,500 debt owed to the Detroit Federal Employees Credit Union and that plaintiff owned a 1973 Chevrolet, while the defendant owned a 1969 Ford and a 1978 Chevrolet.

Defendant testified that she did not want to break the bonds of matrimony.

The trial judge did not include in his opinion a statement regarding the disposition of the debts of the parties. While this Court hears appeals in divorce cases *de novo,* it does not generally reverse a property settlement rendered by the trial court unless it is convinced it would have reached a different result had it sat as the trier of fact. *Irish v Irish,* 59 Mich App 635, 636; 229 NW2d 874 (1975). Several factors, including the source of the property, contribution towards its acquisition, the length of the marriage, the needs of the parties, and the earning abilities of the parties affect the equitable distribution of property in a divorce judgment. *Johnson v Johnson,* 346 Mich 418, 431; 78 NW2d 216 (1956), *Hostetler v Hostetler,* 46 Mich App 724, 726; 208 NW2d 596 (1973), *inter alia.*

Plaintiff testified at the time of trial that he owed $8,500 to the Detroit Federal Employees Credit Union, of which $3,000 of this debt was secured by plaintiff's boat. The money that plaintiff borrowed was used to purchase the Grosse Pointe residence. Plaintiff testified that he had previously borrowed money from the credit union to purchase the Pontiac Township house.

Defendant testified that she was not sure whether the money the parties put down on the Pontiac house came from their joint checking account or from the credit union. Defendant testified that the money she contributed to the joint checking account was used to pay back the credit union. Plaintiff testified on cross-examination that the money borrowed from the credit union was a revolving account and that the plaintiff had used the money in the account in the past for upkeep on his sailboat. Plaintiff stated that, for most of the years of their marriage, the account had also

been used for defendant's expenses. Arguably, at least some of the debt owed the credit union was incurred by the defendant during the marriage, since the plaintiff testified that the defendant also used the account.

The trial judge made no statement in his opinion as to which of the parties, or both, owed the debt to the credit union or the amount owed by each party, if any. A finding of fact on this issue should have been made pursuant to GCR 1963, 517.1.

The facts do not clearly indicate that, had this Court decided the case in the first instance, the amount of $2,700 awarded as attorney fees on behalf of the defendant-wife would not have been allowed. *Irish, supra.*

The trial court, relying on *Kretzschmar v Kretzschmar,* 48 Mich App 279; 210 NW2d 352 (1973), considered the plaintiff's living with another woman while still married to the defendant, as well as an indication of dissipation of some of the plaintiff's income for the benefit of the other woman. The court awarded alimony in the amount of $500 a month until defendant remarried, died, or established residence with a male not related to her for a period of 31 consecutive days in any 12-month period. The award also provided that, should the defendant become employed at an annual income of $13,500 or more at any time prior to January 1, 1982, alimony shall be reduced to $380 per month. After January 1, 1982, if defendant is employed at $15,000 a year or more, alimony shall be reduced to $380 per month.

While the husband argues that there was a marriage breakdown before the divorce was filed and denies dissipating his earnings for the benefit of the other woman, the record is sufficient to

support the trial court's award of alimony to the wife based on disparity in amount as well as capability for earning income. However, to award $500 or $380 as proposed, no matter what change of circumstances occurs in this case in the future, constitutes a clear abuse of discretion.

This Court has held that a pension interest should be included as a marital asset where the pension was created in part from deductions from one of the marriage partners' salary. *Tigner v Tigner*, 90 Mich App 787; 282 NW2d 481 (1979), *Miller v Miller*, 83 Mich App 672; 269 NW2d 264 (1978). See also *Hutchins v Hutchins*, 71 Mich App 361; 248 NW2d 272 (1976).

In *Miller, supra*, 677, this Court remanded the case to the trial court, stating that it should:

"(1) find whether the pension interests have a reasonably ascertainable value or whether the interests are expectancies or subject to contingencies, (2) determine that value, if any, and (3) applying equitable principles, allocate the distributable marital property between the parties. To aid the trial court on remand, we reiterate that pension interests are distributable only if they are marital property with a reasonably ascertainable value. Interests which are contingent upon the happening of an event which may or may not occur are not distributable. The party seeking to include the interest in the marital estate bears the burden of proving a reasonably ascertainable value; if the burden is not met, the interest should not be considered an asset subject to distribution."

It appears that the trial judge determined that the value of the pension benefits as of the date of trial were $26,088.62. The plaintiff had been contributing to the pension for 20 years and had been married to the defendant for ten of those years. The trial court considered somewhat more than

half of plaintiff's $26,088.62 pension as an asset of the marriage. Plaintiff will not receive any pension payments until 1986.

There is no dispute that the equity in the marital home, at the time of the trial, was $33,000. The trial court reasoned that, since the plaintiff-husband's pension interest cannot be divided, the defendant-wife's interest in the pension should be compensated by awarding to her the marital home, with a second lien of $10,000 going to plaintiff. The trial court did not determine how or when the second lien of $10,000 is to be paid off and did not order payment of interest.

The record appears to support an award to each party of $23,022.21 which appears to be arrived at by taking one half of half of the pension, which amounts to $6,522.21, and one half of the marital home equity of $33,000 or $16,500. Be that as it may, the husband will not draw on the pension until 1986 and the wife is awarded the marital home on which the husband has a second lien of $10,000 to be paid someday. The trial court did abuse its discretion on this phase of the property settlement.

This case is remanded to the trial court to make a finding of fact concerning the extent, if any, of each party's obligation to pay off the credit union debt. Further, that part of the award concerned with payment of alimony is amended to permit filing of a petition for a hearing to determine if a change of circumstances has occurred, and in the event a change of circumstances has occurred the alimony payments are to be modified accordingly. The provision for paying off the second lien of $10,000 on the marital home is reversed. Defendant is given 60 days to pay off the plaintiff and, upon failing to do so, the home is to be sold and

the amount owing to the plaintiff on the second lien is to be paid to the plaintiff from the proceeds.

The judgment of the trial court is reversed in part and affirmed in part. No costs or attorney fees are awarded on appeal to either side, neither side having prevailed in full.